# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|                                                    |   |                      |
|----------------------------------------------------|---|----------------------|
| SHAIRA APONTE ORTIZ,                               | : |                      |
|      Plaintiff,           | : |                      |
|                                                    | : |                      |
|      v.                   | : | C.A. No. 16-584JJM   |
|                                                    | : |                      |
| NANCY A. BERRYHILL, ACTING                         | : |                      |
| COMMISSIONER OF SOCIAL SECURITY,                   | : |                      |
|      Defendant.           | : |                      |

## REPORT AND RECOMMENDATION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

On October 23, 2013, Plaintiff Shaira Aponte Ortiz, a non-English-speaking mother of three who moved to New England from Puerto Rico in August 2013, filed her second application for Supplemental Security Income ("SSI") under § 1631(c)(3) of the Social Security Act, 42 U.S.C. § 1383(c)(3) (the "Act"), based on alleged limitations arising from claimed mental impairments consisting of panic attacks, anxiety, depression and bipolar disorder. The Commissioner of Social Security (the "Commissioner") denied her application in reliance on the determination of an Administrative Law Judge ("ALJ") that, despite the impairments of affective disorder and anxiety disorder, she retains the residual functional capacity ("RFC")[1] to perform simple, routine tasks with simple, demonstrated (not written or oral) instructions, limited contact with coworkers and supervisors and no interaction with the public.

Plaintiff has moved to remand or for reversal, arguing that the ALJ failed properly to weigh the medical and other opinion evidence in the record, failed properly to assess Plaintiff's

---

[1] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 416.945(a)(1).

statements regarding the severity of her symptoms, and improperly acted as his own medical expert. Defendant Nancy A. Berryhill asks the Court to affirm the Commissioner's decision. The matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Having reviewed the entire record, I find that the ALJ's findings are amply supported by substantial evidence and recommend that Plaintiff's Motion for Reversal or Remand (ECF No. 9) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 11) be GRANTED.

## I. <u>Background</u>

### A. **Plaintiff's Background**

Plaintiff was a "younger person," twenty-nine years old, on the date she alleges as the onset of disability – March 9, 2012. Tr. 79. At that time she was living in Puerto Rico with her two children, then aged eight and eleven; her third child was born in April 2013. Tr. 196, 359-60. She has her GED and had two brief employment experiences, preparing and delivering pizza and working as a hostess at a school. Tr. 280. Otherwise, she has no past relevant work. Tr. 34, 49-50. While living in Puerto Rico, Plaintiff was found to be fully disabled by the Puerto Rican Administration of Socio-Economic Development Department of Family Nutritional Assistance and Bread-Work Program; documents from Puerto Rico indicate that she was receiving mental health treatment for unspecified conditions and was prescribed Prozac and Klonopin. Tr. 337-40, 346-50. After she moved to Rhode Island and initiated treatment at The Providence Center ("TPC"), Plaintiff stated that medical sources in Puerto Rico had diagnosed bipolar disorder and panic attacks and prescribed Depakote, Paxil, Prozac and Klonopin. Tr. 352. The file under review contains no treating records for the period prior to October 2013 when Plaintiff was first treated at TPC.

Plaintiff's first SSA disability application, also alleging onset on March 9, 2012, was filed on August 13, 2012. Tr. 70. In it, she alleged panic attacks, anxiety and depression. Tr. 70. As far as the record reveals, Tr. 71-74, the only medical evidence presented to support her first application was a consultative examination performed on September 19, 2012, by psychologist Dr. Mark Daniel Sokol.[2] Tr. 341-43. In his report, Dr. Sokol recorded that Plaintiff's behavior was "bizarre," seemingly psychotic, and that she was unable to respond to even basic questions; he was so concerned about her inability to care for her children in light of the displayed level of total incapacity that he contacted the appropriate child protection agency. Tr. 342. After a child welfare investigator told Dr. Sokol that Plaintiff had been interviewed and appeared to the investigator to be "normal . . . no appearance of psychiatric problems," he reported that, "[i]t appears that this claimant was malingering." Tr. 341-42. The application was denied initially on October 12, 2012; no further review was requested. Tr. 275-76.

In connection with the current application, Plaintiff's October 25, 2013, function report states that she cannot be around too many people, but that she is able to care for her six-month-old daughter and two older children, that she goes out for appointments and to take the children to school, that she shops for food, that she attends church twice a week and that she gets along with authority figures (such as "bosses") "fairly well." Tr. 293-300. During her application interview, the field office staffer noted, "[n]o limitations noted, very pleasant, education average, interview in native language." Tr. 277.

Also in connection with the current application, Plaintiff submitted to a consultative examination with psychologist Dr. Lux Teixeira, performed on December 5, 2014. Tr. 359-62.

_____

[2] There is an unexplained inconsistency between Plaintiff's presence in Massachusetts in September 2012 for this consultative examination (coupled with her statement to Dr. Sokol that she "came her [sic] in July" (Tr. 342)) and her testimony that she did not come to the mainland from Puerto Rico on a full time basis until August 2013. Tr. 46. Because the ALJ did not address this inconsistency, it is not considered in this report and recommendation.

This examination was conducted before Plaintiff began taking prescribed medication to address the symptoms caused by her mental health impairments. Tr. 360. Dr. Teixeira noted that he formed an adequate rapport with Plaintiff; based on testing and observation, he found anxious/depressed affect, depressed mood, fair to poor attention and concentration and impaired abstract reasoning. Tr. 361. He assigned a GAF score[3] of 44. Tr. 362. Nevertheless, he also found that her cognitive functioning was in the low average range, that she did not appear to have "significant impairment" in the area of relationships and social functioning, as well as that her "task persistence was adequate." Id.

At the hearing before the ALJ, Plaintiff claimed that she cannot work because she cannot be in a group with too many people. Tr. 50. She described debilitating panic attacks, as well as visual and audial hallucinations; she said that she gets upset easily, is depressed and tired, and that her social activities out of the house are limited in that they do not include parties. Tr. 53, 55. Nevertheless, she also testified that she lives with her boyfriend, cares for her youngest child, prepares breakfast, does the cleaning and visits her mother. Tr. 52-53, 54, 57. When asked if there are times when "you just don't do [chores and cleaning] because of how you feel," she responded, "[t]here are moments that I feel very depressed, but – I don't want to do anything at home, but I have to do it." Tr. 54 (emphasis supplied).

---

[3] A Global Assessment of Functioning ("GAF") score in the 41-50 range indicates "serious impairment in social, occupational, or school functioning." See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR"). By the time of Dr. Teixeira's examination, the DSM had eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–5")). Further, a GAF score assigned by a one-time evaluator has limited weight. See Vieira v. Berryhill, C.A. No. 1:16-CV-00469, 2017 WL 3671171, at *2 (D.R.I. Aug. 25, 2017) ("[T]he extent to which an adjudicator can rely on the GAF score as a measure of impairment severity and mental functioning depends on: (1) whether the GAF rating is consistent with other evidence; (2) how familiar the rater is with the claimant; and (3) the rater's expertise.").

Apart from her report that she once went to an emergency room, Plaintiff has never been hospitalized in connection with her mental health impairments.

**B.      Plaintiff's Medical and Opinion History through Reconsideration Phase**

As of her October 2013 intake at TPC, Plaintiff had been in New England for just a few months, spoke no English, had a five-month-old baby, was living with her three children (whose father was in prison) and a cousin she did not get along with, and had been off all medications since leaving her prescribers in Puerto Rico. Tr. 352-58. Despite these stresses, the TPC intake assessment notes that she had no limitations in adaptive functioning, except for nutrition (because of her poor appetite), that she had no impairment that might preclude employment for at least one year, that, while her interpersonal circle was limited to family, she was looking for a church to attend. Tr. 353. On mental status examination, she was found to be pleasant with no abnormalities except for her self-report of sadness, depression and anxiety. Tr. 355. The examiner specifically recorded his own observation – inconsistent with her self-report – of "euthymic" affect. Tr. 355. The report concludes:

> Client presented as cooperative with her 5 month old infant daughter. She seems to take good care of daughter and attends to her needs. Client had a good attention span, able to provide information, no flight of ideas or grandiosity, no mood swings, affect and mood euthymic, even though she has not been in medications for about 2 months.

Tr. 358. A further assessment to rule out bipolar disorder (based on her report that it was a past diagnosis), therapy and a medication evaluation were recommended. Id.

From November 2013 until January 2014, Plaintiff pursued the recommended therapy with a licensed social worker, Sandra Victorino. Tr. 365-73. Not yet on medication, Plaintiff described herself as irritable and with mood swings, Tr. 371, yet she was able to "manage mood with children," her attention and concentration were "alert" and she reported having a supportive

family.  Tr. 365, 370.  Ms. Victorino wrote: "Reports that when she was taking medication reports that she is able to concentrate, have conversations with other and calm.  Reports that when on medication she feels goal oriented and focused."  Tr. 371.

On January 21, 2014, Plaintiff had the required (by TPC) pre-medication psychiatric evaluation with Dr. Sharath Puttichanda.  Tr. 374-76.  Despite the observation that "for the past five months she has not been on medication," Dr. Puttichanda found her to be "pleasant and cooperative," "future oriented," "caring for the 8 month old well," that "she seems to convey situational depression induced by stressors," "no disturbances of appetite" and "[n]o gross disturbances of sleep."  Tr. 374.  On examination, Dr. Puttichanda found:

> She is polite and cooperative . . . speaks in a regular rate and rhythm.  She expresses her mood as anxious but affect is stable, full range and appropriate, Thought process is linear and logical.  No delusions elicited.  Denied SI or HI; No perceptual abnormality; Insight is fair and judgment is good.

Tr. 375.  Dr. Puttichanda rejected the diagnosis of bipolar disorder:

> Given her past diagnosis of bipolar disorder I tried to screen for mania/ hypomania or severe MDD.  She did not endorse any of those symptoms.  Also in screening for post partum depression and the risk associated with bipolar disorder there was no convincing evidence in her case.

Id.  He noted that her "history of mood lability and fluctuation she describes seems very situational."  Id.  Dr. Puttichanda found that "her obvious psychosocial stressors contribute heavily to mood and a general sense of feeling overwhelmed," and that she would "greatly benefit" from therapy; he also prescribed medication for anxiety and depression, with limits on quantity.  Id.

After this appointment, through May 2014, Ms. Victorino continued therapy while Plaintiff was taking prescribed medication, which was efficacious.  Tr. 379-80 ("Ct. reports that feels medication is starting to help").  During these therapy appointments, Ms. Victorino's

observations were largely normal, except for depressed and anxious mood, coherent but rapid speech, frequent waking at night and decrease in energy.  Tr. 365, 370-73, 379-80, 397.  Plaintiff also began to see Nurse Marol Kerge for what the record labels as "medication visit[s]."  Tr. 377, 381, 419.  Nurse Kerge is described in the record as the "prescriber."  E.g., Tr. 379.  Plaintiff saw Nurse Kerge three times through the end of April 2014; during these appointments Nurse Kerge's observations on examination are normal except for depressed and anxious mood, which improved as Plaintiff began taking prescribed medication.  377, 381, 419; see Tr. 381 ("mood is more stable since Depakote was started and has less irritability . . . Behavior: calm, cooperative").

### C.     Opinion of Expert SSA Psychologist during Reconsideration Phase

The ALJ's RFC rested on the "substantial weight" he afforded to the opinion of the expert Social Security Administration ("SSA") psychologist, Dr. Jan Jacobson, during the reconsideration phase.  Dr. Jacobson based his opinion on his review of the medical records, function report and field office observations summarized above.  Signed on May 8, 2014, the opinion concludes that Plaintiff's affective and anxiety disorders amounted to severe impairments, but that the impact on her activities of daily living was mild, while the impact on her social functioning and ability to maintain concentration, persistence and pace was moderate, particularly in light of her "improvement in depression."  Tr. 92-93.  In forming this opinion, Dr. Jacobson considered the consultative examination report of Dr. Teixeira but noted that the low GAF score mentioned in it was not supported by the treating record.  Tr. 93.  Regarding Plaintiff's RFC, Dr. Jacobson opined that she is limited in her ability to concentrate, persist and adapt, but that she can perform simple, basic tasks as evidenced by activities reflected in the record, including her capacity to care for and raise three children and attend to activities of daily

living and basic household tasks like cooking and cleaning.  Tr. 95.  His opinion that she could

relate adequately to co-workers and supervisors, but not the public, was based on record

references to anxiety with others, her interaction with family, shopping and attendance at church,

as well as the function report response.  Id. (gets along "fairly well" with persons in authority).

### D.     Plaintiff's Medical and Opinion History after Reconsideration Phase

After her application was denied on reconsideration, Plaintiff continued therapy with Ms.

Victorino and medication visits with Nurse Kerge.  In therapy, Plaintiff addressed a conflict with

a cousin that was serious enough for Ms. Victorino to provide guidance about getting a

restraining order.  Otherwise, the Victorino therapy notes reflect the supportiveness of Plaintiff's

mother, who had moved to Rhode Island, and that Plaintiff continued to "benefit[] from med

management," and "not as much irritability"; they also reference Plaintiff's willingness to attend

a group and to work on learning English.  Tr. 397-403.

With Nurse Kerge during this period, there are four appointments.  They reflect Nurse

Kerge's rising concern about prescribing Depakote without the lab work that, according to Nurse

Kerge, Plaintiff persistently failed to procure.  Tr. 421, 427; see also Tr. 423 (reinstructing

Plaintiff on proper dosage for medication).  At the last encounter before Nurse Kerge signed his

opinion, the September 26, 2014, treating note states, "Reports doing better recently, mood much

better.  Intermittent anxiety.  Sleeps well."  Tr. 427.  Except for an observation of anxious mood,

Nurse Kerge's mental status examination at this medication visit is entirely normal.  Tr. 428.

In his September 29, 2014, opinion, Nurse Kerge opined that Plaintiff would be

moderately impaired in her ability to perform even simple work.  Tr. 389.  It is impossible to

discern what clinical sources Nurse Kerge relied on for this aspect of his opinion; he refers to a

"psychiatric evaluation," yet the only one of record is that of Dr. Puttichanda, who did not

comment on attention, concentration, cognitive capacity or task persistence, although he did observe that Plaintiff had "situational depression," was "future oriented," raising three children, was caring well for her eight-month-old baby, planned to move with her children out of the home shared with a friend because she believed that she "does well when she is by herself," and denied "any deficits in child care." Tr. 374. Also inconsistent with this aspect of his opinion, Nurse Kerge's treating notes reference mental status examinations that consistently reflect, "Fund of Knowledge: Average; Attention & Concentration: Alert; Memory: Intact." Tr. 377, 381, 420, 422, 423, 426, 428.

The other aspect of Nurse Kerge's opinion relates to Plaintiff's ability to interact with the public, co-workers and supervisors; he checked boxes indicating that her ability to deal with the public is markedly limited, while her ability to interact with co-workers and supervisors is even more limited – "extreme." Tr. 390. To support this opinion, Nurse Kerge noted only, "irritability and anxiety considerable." Id. This opinion clashes with Plaintiff's own statement that she gets along "fairly well" with authority figures, Tr. 299, with the repeated treating references to her as "pleasant" and "cooperative" and with Dr. Teixeira's opinion that she does not have significant impairment in area of relationships and social functioning. E.g., Tr. 355, 358, 374, 408. It also is inconsistent with Nurse Kerge's own descriptions of Plaintiff as "cooperative," or "calm," or "calm, cooperative," including at the treating appointment immediately prior to signing his opinion. Tr. 377, 381, 422, 428.

Once she procured this opinion from Nurse Kerge, Plaintiff appears to have stopped showing up for appointments at TPC. Ultimately in November 2014, she was discharged based on "ftk multiple appointments." Tr. 404. She did not return to TPC until January 2015, when she said that she wanted "to get back on meds." Tr. 407. A new initial assessment on January

13, 2015, noted that "[s]he reports she is a full time mother that has been her primary job," as well as that she had developed a "good relationship" with a new boyfriend. Id.; see Tr. 434 (Plaintiff "in supportive relationship with boyfriend"). She resumed therapy with a licensed social worker, Raquel Kenyon, who recorded that she "appears stable . . . mildly depressed," but largely normal. Tr. 413. In February 2015, Plaintiff resumed taking prescribed medication, with medication visits with Nurse Kerge. Once medication was restarted, Ms. Kenyon observed that, "since taking medication she has felt less depressed, with more motivation, less irritable, with less anxiety . . . stable." Tr. 415. Nurse Kerge's notes similarly reflect that she is "proud of being a full time mother caring for her children." Tr. 429. By the end of the period covered by the record, Plaintiff was again canceling and failing to appear at appointments, Tr. 418, 433, and failing to get critical lab work. Tr. 433. As a result, she was discharged for a second time shortly before the ALJ hearing in connection with her application. Tr. 441. The discharge record notes that Plaintiff's mood had stabilized as of the last time she had been seen, in August 2015. Tr. 441.

## II.    Issues Presented

Plaintiff's contends that the ALJ failed properly to weigh medical and other opinion evidence, failed properly to assess her symptoms and credibility and improperly acted as his own medical expert.

## III.    Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v.

Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 416.929(a).

The Court must reverse the ALJ's decision on plenary review if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991). The Court may remand a case

to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences.  Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).  To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001); accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).  Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision. Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).

**IV.     Disability Determination**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 416.905.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 416.905-911.

**A.     Five Part Analysis**

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 416.920(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  Id. § 416.920(c).  Third, if a

claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 416.920(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. Id. § 416.920(e). Fifth, if a claimant's impairments (considering her RFC, age, education and past work) prevent her from doing other work that exists in the local or national economy, then she is disabled. Id. § 416.920(f). Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five. Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of her insured status for the purposes of disability benefits. Deblois v. Sec'y of Health & Human Servs., 686 F.2d 76, 79 (1st Cir. 1982); 42 U.S.C. §§ 416(i)(3), 423(a), 423(c). If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied despite her disability. Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

**B.      Treating Physicians and Other Sources**

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise. See Rohrberg v. Apfel, 26 F.

Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 416.927(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 416.927(c)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must articulate the weight given, providing "good reasons" for the determination.  See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R § 416.927(c).  A treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  See 20 C.F.R. § 416.927(c)(2).  If a treating source is not accorded controlling weight, the ALJ must apply the factors listed in 20 C.F.R. § 416.927(c).  As SSR 96-2p provides:

> The notice of the determination or decision must contain specific reasons for the
> weight given to the treating source's medical opinion, supported by the evidence
> in the case record, and must be sufficiently specific to make clear to any

> subsequent reviewers the weight the adjudicator gave to the treating source's
> medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188 (July 2, 1996). The regulations confirm that, "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 416.927(c)(2). However, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

A treating source who is not a licensed physician or psychologist is not an "acceptable medical source." 20 C.F.R. § 416.913; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment. SSR 06-03p, 2006 WL 2263437, at *2. An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function. Id. at *2-3. In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist. Id. at *5. Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file. Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 416.927(d). The ALJ is not required to give any special significance to

the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity ("RFC"), see 20 C.F.R. §§ 416.945-946, or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 416.927(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### C.    Evaluation of Subjective Symptoms

When an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. See DaRosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Rohrberg, 26 F. Supp. 2d at 309-10. A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence. See Frustaglia, 829 F.2d at 195. The lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence so that the credibility determination is determinative, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

Guidance in evaluating the claimant's statements regarding the intensity, persistence, and limiting effects of subjective symptoms will soon be provided by the Commissioner's 2016 ruling, which supersedes SSR 96-7p.[4] SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). Under the new standard, in considering the intensity, persistence, and limiting effects of an individual's

---

[4] At the time the ALJ conducted the hearing and issued his decision in this case, SSR 96-7p continued to be controlling. SSR 16-3p is effective for cases when the ALJ's decision is issued after March 28, 2016. See Lara v. Comm'r of Soc. Sec., No. 16-16247, 2017 WL 3098126, at *7 n.5 (11th Cir. July 21, 2017) (per curiam) ("SSR 16-3p became effective in March 2016 – after the ALJ's decision – and thus is inapplicable here").

symptoms, the ALJ must consider the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record. Id. at *4. The ALJ must also consider whether a claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record. Id.

## V.    Analysis

### A.    Improper Assessment of Opinion and Medical Evidence

Plaintiff aims a blunderbuss at the ALJ's approach to the opinion and medical evidence. First, she contends that the ALJ erred in failing to dive into the treating record and assign weight to the findings and observations recorded at the psychiatric evaluation performed by Dr. Puttichanda, at each therapy appointment Plaintiff had with Ms. Victorino and Ms. Kenyon and at each medication visit with Nurse Kerge. Second, Plaintiff attacks the ALJ's treatment of Dr. Teixeira's consultative examination report, arguing that he misread Dr. Teixeira's evaluation of attention and concentration, failed to assign weight to the report and failed to cite the report in support of the RFC. Third, while acknowledging that Nurse Kerge is not an "acceptable medical source,"[5] Plaintiff contends that the ALJ erred in failing to afford his opinion great weight. Fourth, Plaintiff challenges the ALJ's reliance on Dr. Jacobson, arguing that his opinion is based only on the Teixeira report and two isolated treating notes, is inconsistent with the balance of the record and provides only anecdotal and nonmedical explanations for the RFC findings.

---

[5] The Court should note that licensed nurse practitioners and physician assistants (like Nurse Kerge) will be considered "acceptable medical sources," effective with claims filed on or after March 27, 2017. 20 C.F.R. §§ 416.902(a)(7)-(8), 416.325. In recognition of the "advanced level of care they provide in the modern healthcare delivery system," the Commissioner has amended the regulations to reflect this change. 82 Fed. Reg. 5844, 5845-46 (Jan. 18, 2017) (to be codified at 20 C.F.R. § 416.902).

Most of this fusillade is troublingly comprised of misstatements of what is actually in the record or misstatements of applicable law. For the reasons that follow, I find that none of her salvos meet the mark.

Plaintiff's opening argument that the ALJ was required to assign weight to every observation or opinion expressed by the TPC team, including Dr. Puttichanda, Ms. Victorino, Ms. Kenyon and Nurse Kerge, is contrary to applicable law. The ALJ's obligation to assign weight is limited to "[m]edical opinions [that] are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1). Otherwise, it is well settled that an ALJ may summarize the medical findings, as was done here. See Rodriguez v. Sec'y of Health & Human Servs., 915 F.2d 1557, 1990 WL 152336, at *1 (1st Cir. Sept. 11, 1990) ("An ALJ is not required to expressly refer to each document in the record, piece-by-piece.").

This argument independently fails because the TPC treating notes do not support Plaintiff's conclusion that her limitations are so extreme as to preclude all work. To the contrary, Dr. Puttichanda found Plaintiff to be functioning relatively well in an extremely stressful circumstance resulting in situational depression, despite the lack of the support of the medication she has taken in the past. See Tr. 374-76. Similarly, the treating observations of both Nurse Kerge and Ms. Victorino are accurately reflected in Dr. Jacobson's opinion that Plaintiff's limitations are no more than moderate. And the treating records of Nurse Kerge and Ms. Kenyon from the period after Dr. Jacobson's file review are even more benign. E.g., Tr. 415 ("since medications, less depressed, with more motivation, less irritation, less anxiety, . . . stable"); Tr. 427 ("doing better recently, mood much better, intermittent anxiety"). Thus, if the ALJ had

discharged the laborious (and unnecessary) task of separately assigning weight to every treating record in the TPC file, the outcome would not alter the conclusion that these treating records, as interpreted and evaluated by the SSA expert, Dr. Jacobson, constitute substantial support for the ALJ's RFC.

Plaintiff's argument that the ALJ's detailed and nuanced discussion of the Teixeira consultative examination report (Tr. 31-32) is tainted must suffer a similar fate. For starters, the contention that the ALJ wrongly labeled Dr. Teixeira's assessment of attention and concentration as "moderate" misquotes the decision. Rather, the ALJ accurately sets out the Teixeira finding of "fair to poor" attention and concentration; it is "limitations with respect to task persistence and social contact" that the decision labels as moderate. Tr. 31. The accusation that the ALJ failed to cite the Teixeira report in support of the RFC is equally inaccurate – the ALJ includes a detailed review of the Teixeira report in the RFC analysis and specifically adopted a restriction to "instructions that are by demonstration rather than oral or written" based on the Teixeira report. Tr. 31-32. And Plaintiff's complaint that the ALJ failed to prescribe a specific weight to the Teixeira report is contrary to the law in this district that such a report is not a "[m]edical opinion" as to which the weight must be articulated. See Cruz v. Colvin, C.A. No. 14-526ML, 2016 WL 1068860, at *11 (D.R.I. Feb. 18, 2016), adopted, 2016 WL 1069059 (D.R.I. Mar. 17, 2016) ("[A]s long as the report is considered, courts are reluctant to find that an ALJ's failure to articulate or explain the weight given to the report of an consultative examiner necessarily amounts to error, never mind reversible error.") (citations omitted).

Plaintiff's attack on the ALJ's discounting of Nurse Kerge's opinion rests on the faulty premise that the opinion is well supported by Nurse Kerge's seven treating encounters with Plaintiff and is consistent with the other TPC records, the Teixeira report and Plaintiff's

statements in support of her application. None of these propositions withstands scrutiny. As the ALJ found, confirmed by Dr. Jacobson, Nurse Kerge's own treating notes contradict his opinion. For example, the conclusion that Plaintiff would be moderately impaired in her ability to perform even simple work clashed with Nurse Kerge's consistent treating references to "Fund of Knowledge: Average; Attention & Concentration: Alert; Memory: Intact." Compare Tr. 389, with, e.g., Tr. 428. Similarly, his opinion that Plaintiff cannot interact with the public, co-workers or supervisors clashes with the treating description of Plaintiff as "cooperative," or "calm," or "calm, cooperative," including at the treating appointment immediately prior to signing his opinion. Tr. 377, 381, 422, 428. Nurse Kerge's opinion also is profoundly different from the balance of the TPC treating record, particularly the psychiatric evaluation of Dr. Puttichanda, whose mental status examination performed before Plaintiff resumed medication resulted in largely normal findings. Nurse Kerge's opinion is also inconsistent with the Teixeira findings that Plaintiff "does not appear to have significant impairment in" the area of "relationships and social functioning" and that Plaintiff's "task persistence was adequate." Tr. 362. And Nurse Kerge's opinion of "extreme" limitations in the ability to interact with supervisors is dramatically inconsistent with Plaintiff's function report response that she gets along "fairly well" with authority figures like bosses. Tr. 299.

Plaintiff's final attack is her assault on the ALJ's reliance on Dr. Jacobson's opinion. She argues that, instead of reviewing the entire file as of the date of his review, Dr. Jacobson actually performed a blinkered quick-look, examining only three isolated items that are mentioned specifically in the reconsideration findings of fact. Tr. 91-92. This argument is based on a misstatement (troubling to the Court) of what the findings of fact actually say: in addition to quoting in full from two representative treating notes and mentioning "psych CE," it also lists,

"Recon Prov Center MER." Tr. 91; see Tr. 89-90 (listing TPC records as received prior to reconsideration review). Further, the predicate for this argument is a misconception of the nature of what an SSA file reviewer does – as Dr. Jacobson attested, "[t]his reconsideration file has been thoroughly reviewed to ensure that the total evidence of record is sufficient and consistent to support the proposed determination." Tr. 97.

Plaintiff's alternative argument – that Dr. Jacobson's narrative explanations are "anecdotal and nonmedical" – does not make sense. Using his medical expertise as a psychologist, Dr. Jacobson marshaled the record references to Plaintiff exhibiting the capacity to function with respect to each functional category;[6] the ALJ was entitled to rely on these expert conclusions. Viveiros v. Astrue, CA No. 06-419T, 2009 WL 196217, at *8 (D.R.I. Jan. 23, 2009) ("the ALJ was entitled to rely upon the opinion of the DDS reviewing physician") (citing Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991)). These references are neither anecdotal nor nonmedical; rather, they summarize the record-based facts deemed medically pertinent by a psychologist with the training and expertise to make such judgments. Finally, Plaintiff relies on the throwaway argument that Dr. Jacobson's opinion is not well supported in that it is inconsistent with the balance of the record. While she does not name the supposedly inconsistent records, the Court's exhaustive review of the entirety of the file uncovered only Dr. Jacobson's openly expressed, and appropriately explained, disagreement with the GAF score assigned by Dr. Teixeira. Tr. 93. The only post-file-review record that is inconsistent with Dr. Jacobson's opinion is Nurse Kerge's opinion, which is also dramatically at

---

[6] To illustrate, in the area of social interaction, Dr. Jacobson rated Plaintiff as having specific limitations and also provided as a narrative explanation for the finding with respect to "social interaction capacities and/or limitations": "Claimant interacts with family, she shops, goes to church, has no authority issues. She is though anxious with others." Tr. 95. Coming from an expert psychologist, this explanation simply is not "anecdotal and nonmedical."

odds with the TPC treating record (including Nurse Kerge's own treating notes), with Dr. Teixeira's report and with Plaintiff's statement on application.

At bottom, the law is clear that the ALJ is not required to give greater weight to the opinions of examining sources than to those of the nonexamining consultants. See Arroyo v. Sec'y Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991). In this Circuit, it is well settled that the ALJ had the discretion to resolve the conflicts between the report of Dr. Teixeira and the opinion of Nurse Kerge on one hand and the opinion of Dr. Jacobson on the other. See Rivera-Torres v. Sec'y Health & Human Servs., 837 F.2d 4, 5 (1st Cir. 1988). And, while Dr. Jacobson did not have the benefit of reviewing records after May 2014, the TPC records from the later period not only do not document a substantial decline in Plaintiff's condition, but rather reflect Plaintiff's improved functioning with medication and with a more stable living situation following the arrival of her mother and the formation of a supportive relationship with a new boyfriend. See Crow v. Colvin, No. CA 13-225PAS, 2014 WL 3966362, at *12 (D.R.I. Aug. 13, 2014) ("With a dearth of medical evidence suggesting any 'significant worsening' in Plaintiff's condition, the ALJ committed no error in relying on medical opinions procured over a year prior to making his decision.") (citations omitted). I find no error in the ALJ's reliance on Dr. Jacobson.

When Plaintiff's argumentative misstatements of law and fact are swept aside, what remains is a request that this Court re-weigh the evidence, which it must not do. Seavey, 276 F.3d at 10. As Greene v. Astrue states, "Plaintiff must show not only the existence of evidence in the record *supporting* her position but must also demonstrate that the evidence relied on by the ALJ is either insufficient, incorrect, or both." No. 11-30084, 2012 WL 1248977, at *3 (D. Mass. Apr. 12, 2012) (internal citations omitted) (emphasis in original). Other than pointing to the

flawed Kerge opinion, Plaintiff has failed to do either.  I find no error in the ALJ's analysis of the opinion and medical evidence and do not recommend remand on this basis.

**B.      Improper Assessment of Subjective Symptoms**

While conceding that the ALJ cited the correct legal standard for evaluating her subjective symptoms, Plaintiff contends that he failed properly to consider whether her hearing testimony was reasonably consistent with the evidence and failed to give full consideration to the relevant factors listed in 20 C.F.R. § 416.929(c)(3); see DaRosa, 803 F.2d at 26.  To support the argument, Plaintiff cites to treating references that she contends are consistent with the severity of the symptoms as she described them at the hearing.

The Court's review of Plaintiff's citations to the treating record turned up an array of troubling misstatements and mischaracterizations.  By way of a single example, Plaintiff represents that Nurse Kerge's mental status examination of August 2015 reflects "suicidal ideation with a plan."  ECF No. 9-1 at 15 (emphasis supplied).  In fact, at that appointment, Nurse Kerge wrote, "reports suicidal ideation without intent & without a plan."  Tr. 434 (emphasis supplied).  More importantly, far from supporting Plaintiff's hearing testimony, this treating record reflects Plaintiff's success in forming a "supportive relationship" with a boyfriend, her pride in "being a full time mother taking care of her children," and her happiness with her new living arrangement in a subsidized apartment in Woonsocket, despite her continuing report of depressed mood, sleep disturbance and decreased energy.  Id.  And within less than two weeks of this appointment, Plaintiff was discharged from TPC for the second time based on her failure to make appointments; the discharge summary notes that her "mood has been stable."  Tr. 441.

Similarly, Plaintiff hyperbolically labels as "egregious," ECF No. 9-1 at 16, the ALJ's finding that her testimony regarding panic attacks, frequent anger and hallucinations was "not entirely credible." She ignores the ALJ's appropriate reliance, buttressed by Dr. Jacobson's observations, on Plaintiff's own statements about effectively caring for her children, including taking them to appointments and school, shopping, going to church, getting along fairly well with authority figures, forming a supportive relationship with a new boyfriend and interacting with family, including going to her mother's house. There is no error in the ALJ's finding that the hearing testimony was inconsistent with these admitted activities, which are reflected in both Plaintiff's statements to treating sources and those made in connection with her application. I find that the ALJ's determination is well supported by substantial evidence. See Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) (citing Berrios Lopez, 951 F.2d at 429) ("While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding.").

Finally, I find no basis for remand arising from the ALJ's reliance on Plaintiff's nonattendance at treatment as evidence undermining the credibility of her claim of severe symptoms, despite his failure to ask her why she stopped going. See Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (appropriate to consider gaps in medical treatment as "evidence" that claimant's pain was not as intense as alleged). With a treating record reflecting TPC's focus on the importance of Plaintiff's coming to her appointments, including its repeated communications with her about missed appointments, yet she failed to attend, coupled with the ALJ's other well-supported reasons for discounting her subjective testimony, any potential error in the ALJ's failure to inquire about why she twice

dropped out of treatment is harmless. See Fortin v. Colvin, Civil Action No. 3:16-cv-30019-KAR, 2017 WL 1217117, at *14 (D. Mass. Mar. 31, 2017) (even assuming ALJ erred by including refusal of treatment, error did not taint ALJ's credibility analysis as to require remand); Beaudet v. Colvin, No. CA 14-112 S, 2015 WL 5510915, at *17 (D.R.I. Sept. 16, 2015) (ALJ's failure to ask about failure to seek treatment is harmless error where assessment of credibility of plaintiff's subjective complaints is well supported by other substantial evidence). Under such circumstances and in the context of this record, the ALJ's finding that she was relatively stable even during periods of poor compliance with treatment or a lapse of treatment is well supported. See Beaudet, 2015 WL 5510915, at *16-17.

"[M]indful of the need to tread softly, because it is the responsibility of the Commissioner to determine issues of credibility and to draw inferences from the record," I find no material error in the ALJ's sufficiently-supported determination that Plaintiff's hearing testimony regarding the severity of her subjective symptoms was not entirely credible. Cruz v. Astrue, Civ. No. 11-638, 2013 WL 795063, at *16 (D.R.I. Feb. 12, 2013).

### C.      Improper Lay Interpretation of Medical Evidence

Plaintiff's argument that the ALJ wrongly interpreted raw medical data deserves short shrift. See Nguyen, 172 F.3d at 35; Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996). Far from playing armchair psychologist, the ALJ properly relied on the opinion of the SSA expert, Dr. Jacobson, coupled with his own exhaustive survey of the record. See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987) (ALJ is entitled "to piece together the relevant medical facts from the findings and opinions of multiple physicians"). There is no whiff of error in this aspect of the ALJ's well-reasoned and well-supported decision.

## VI.    Conclusion

Based on the foregoing analysis, I recommend that Plaintiff's Motion for Reversal or Remand (ECF No. 9) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 11) be GRANTED.  Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
November 9, 2017